WEINBERG, ROGER & ROSENFELD
ASHLEY K. IKEDA (2955-0)
JERRY P.S. CHANG (6671-0)
Central Pacific Plaza
220 South King Street, Suite 901
Honolulu, HI  96813
Telephone:  (808) 528-8880
Facsimile:  (808) 528-8881
E-mail: aikeda@unioncounsel.net
          jchang@unioncounsel.net

ROBBINS GELLER RUDMAN & DOWD LLP
BENNY C. GOODMAN III (Cal. Bar No. 211302)
ERIK W. LUEDEKE (Cal. Bar No. 249211)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423
E-mail: bennyg@rgrdlaw.com
          eluedeke@rgrdlaw.com
*Pro Hac Vice* Anticipated

Attorneys for Plaintiff MERIDIAN OHC PARTNERS, LP,
Derivatively on Behalf of CYANOTECH CORPORATION

### UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| MERIDIAN OHC PARTNERS, LP, Derivatively on Behalf of CYANOTECH CORPORATION, ) ) ) | Civil No. |
| Plaintiff, ) | **VERIFIED SHAREHOLDER** |
| vs. ) | **DERIVATIVE COMPLAINT** |
| MICHAEL A. DAVIS, GERALD R. ) | **FOR BREACH OF FIDUCIARY** |
| CYSEWSKI, NANCY E. KATZ, WALTER ) | **DUTY, ABUSE OF CONTROL,** |
| B. MENZEL, DAVID M. MULDER and ) | **GROSS MISMANAGEMENT,** |
| DAVID L. VIED, ) | **AND WASTE OF CORPORATE** |
| Defendants, ) | **ASSETS; VERIFICATION;** |
| – and – ) | **DEMAND FOR JURY TRIAL;** |
| CYANOTECH CORPORATION, a Nevada ) corporation, ) | **SUMMONS** |
| Nominal Defendant. ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH
OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS
MISMANAGEMENT, AND WASTE OF CORPORATE ASSETS**

Plaintiff Meridian OHC Partners, LP ("Meridian" or "plaintiff"), by its attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, and Waste of Corporate Assets (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      According to public filings, Cyanotech Corporation ("Cyanotech" or the "Company") manufactures and distributes products derived from microalgae. The Company's Hawaiian BioAstin and Hawaiian Spirulina Pacifica products account for 100% of sales.  The Company operates a production location at a 96-acre facility on the Kona Coast of Hawaii.

2.      As Cyanotech's corporate fiduciaries, defendants owe the Company fiduciary duties of loyalty and care – the highest duties known to the law. Nonetheless, defendants have forsaken all of Cyanotech's shareholders but one – defendant Michael A. Davis.  At every turn, Cyanotech's Board of Directors (the "Board") has acted to further the interests of the Company's largest shareholder, defendant Davis, to the detriment of every other Cyanotech shareholder.  These faithless acts began at least in 2011 and continue to this day.

3.     Defendant Davis became the Company's largest shareholder in 2002 and his holdings are held largely via a group of so-called charitable family foundations under defendant Davis's direct control.  Starting in 2008, defendant Davis's position at the Company met the first of several challenges when a prominent European customer, VitaeLab AS, acquired a 9.7% stake in the Company.  During the process of acquiring its Cyanotech shares, VitaeLab filed two Schedule 13Ds with the U.S. Securities and Exchange Commission ("SEC") disclosing that it was an active investor seeking to influence the Company.

4.     In the face of this challenge, defendant Davis took action to maintain his personal control over the Company.  First, he was named Chairman of the Board on April 13, 2011.  Second, he conceived a secret scheme to buy more Cyanotech shares by conspiring on a share-buying scheme with the Rudolph Steiner Foundation ("RSF").  Eventually, defendant Davis effected the purchase all of VitaeLab's 9.7% stake in the Company for the benefit of Davis and his family through an RSF proxy.  None of this activity was disclosed, as required by federal law, and no shareholders other than defendant Davis and RSF were aware (i) of the relationship between defendant Davis and RSF, (ii) of their ability to control the Company and the Board of the Company, or (iii) that defendant Davis had taken for himself the corporate opportunity presented by the availability of the VitaeLab shares.

5.     Defendant Davis's efforts became more urgent when the Company's products were featured positively and prominently in January 2012 by television personality Dr. Oz and demand for the Company's products exploded.  However, rather than striving to improve shareholder value as a result of the increased demand for the Company's products, defendant Davis commenced a long-term program to stall and/or prohibit the growth and/or expansion of the Company's operations to accommodate the increased demand.  Throughout his tenure, defendant Davis worked to thwart efforts to expand the Company's supply and distribution of its products and slowed new product development.  Indeed, at defendant Davis's behest, defendants created a revolving door of executive and managerial talent at the Company – often strangely timed to remove executives and managers when it became apparent they were succeeding in improving corporate performance and/or maximizing shareholder returns.

6.     Defendants' efforts to support defendant Davis appear to be designed to protect defendant Davis's dominant position at the Company (i) by discouraging institutional investors from discovering and participating in the growth potential at Cyanotech, but also (ii) by keeping scrutiny off of defendant Davis's improper use of his purported charitable family foundations.  As Meridian discovered through its investigation, defendant Davis's scheme with RSF to control more shares of the Company appears to violate the U.S. Internal Revenue Service ("IRS") rules and

regulations regarding non-profit charitable foundations.  Worse yet, media reports indicate that 97% of defendant Davis's Skywords Family Foundation's charitable donations were "made to entities that financially benefit Davis."  The same pattern appears to repeat for all of defendant Davis's so-called charitable family foundations.  All of these issues subject defendant Davis to substantial penalties, fines, and tax consequences.

7.    Despite defendants' efforts, including allowing no outbound investor relations and the active discouragement of communications between management and interested outsiders, Cyanotech's huge potential was noticed by investors, including Meridian, the plaintiff here.  Prior to discovering defendant Davis's illicit scheme to control the Company, Meridian took advantage of periodic buying opportunities, eventually acquiring an approximate 13% interest in the Company by early 2016.  Once Meridian's interest in the Company's growth potential became a threat, defendants' efforts to thwart minority shareholders intensified.

8.    On April 4, 2016, the Company's outside shareholders learned that Brent Bailey had been removed from his position as Chief Executive Officer ("CEO").  No explanation for this sudden change in leadership was provided by the Company.

9.    Shocked by the development, which it reasonably believed jeopardized the potential of Cyanotech to continue to capitalize on the business opportunities it

had been pursuing, Meridian commenced an investigation into what it characterized as the "inexplicable and unexplained" actions of the Company. Meridian soon discovered defendant Davis's secret schemes involving RSF, including his use of a proxy he controlled to purchase VitaeLab's 9.7% stake in the Company.

10.     Meridian alerted the Board to defendant Davis's fiduciary breaches via a May 6, 2016 letter. Not only did defendants refuse to take action to protect the Company and its minority shareholders, they actively fought Meridian's efforts to expose the truth. Recognizing the futility of obtaining reform via Cyanotech's Board, Meridian was forced to file a lawsuit to expose defendants' efforts to aid and abet defendant Davis's fiduciary failures and to compel required disclosures under the federal securities laws.

11.     The parties resolved Meridian's lawsuit, with defendant Davis making filings with the SEC admitting that he secretly caused RSF to purchase VitaeLab's 9.7% stake and that defendant Davis and RSF had been operating as an SEC-recognized "group" since at least 2011. Having been alerted to defendant Davis's wrongdoing by Meridian's lawsuit, and despite Davis's admission regarding his masterminding of the RSF transaction, defendants have taken no action to put a stop to defendant Davis's deleterious actions. To the contrary, defendants have consciously chosen to look the other way, as defendant Davis continues to abuse

minority shareholders in an effort to keep control of the Company and avoid any scrutiny of his suspect family foundations.

12.     Although Cyanotech has been severely injured, defendants have not fared nearly so badly.  On the contrary, defendants have collectively pocketed more than $3 million in fees, salaries, incentive-based compensation payments, and other benefits that were not justified in light of Cyanotech's poor performance while under their stewardship.  These payments wasted valuable corporate assets and unjustly enriched defendants.  Moreover, defendant Davis appears to have (i) usurped the Company's opportunity to dispose of VitaeLab's stake in the best interests of all shareholders, rather than just the largest shareholder, and (ii) caused the Company to expend precious funds defending defendant Davis's securities reporting violations to which he subsequently admitted.

13.     Nevertheless, despite years of opportunity and ever-growing evidence of misconduct by defendant Davis, the Board has not taken any legal action against the directors and officers responsible for this debacle, nor would they, because every member of the Board faces a substantial risk of liability in connection with the actions described herein.  Accordingly, by this action, plaintiff seeks to vindicate Cyanotech's interests against these wayward fiduciaries.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 28 U.S.C. §1332(a)(2), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Cyanotech maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Cyanotech, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District.

## PARTIES

**Plaintiff**

17.     Plaintiff Meridian OHC Partners, LP is an investment firm that primarily invests in small public companies in an effort to work with senior management to maximize a company's value.  Meridian has continuously held Cyanotech shares since March 2016 and is the Company's third largest shareholder.  Meridian is a citizen of the states of Connecticut, Florida, Texas and Wisconsin.

**Nominal Defendant**

18.     Nominal defendant Cyanotech Corporation is a Nevada corporation with its principal executive offices located at 73-4460 Queen Kaahumanu Highway, Suite #102, Kailua-Kona, Hawaii 96740.  The Company produces the supplements spirulina and astaxanthin for both wholesale and retail markets from a 96-acre facility on the Kona Coast of Hawaii.

**Individual Defendants**

19.     **Michael A. Davis**.  Davis joined the Board in March 2003 shortly after acquiring a significant ownership position in the Company.  Davis has served as Chairman of the Board since April 13, 2011 and serves as Chairman of the Nominating and Corporate Governance Committee.  Davis is the President of the Skywords Family Foundation, which, together with other Davis-controlled affiliates, directly owns approximately 16.6% of Cyanotech's stock.  Davis and

RSF admitted they form a "group" within the meaning of §13(d)(3) of the Securities Exchange Act of 1934. RSF owns approximately 15.9% of Cyanotech's stock. Davis is also President of Ginungagap Foundation, a non-profit that is the beneficiary of the Donor Advised Fund sponsored by Rudolf Steiner that Davis endowed with Cyanotech stock. Davis is a citizen of the state of California.

20.     **Gerald R. Cysewski**. Cysewski co-founded the Company and has been a director since 1983. Cysewski is Cyanotech's CEO and has served as the Company's Chief Scientific Officer and Vice Chairman of the Board. Cysewski previously acted as the Company's President and CEO at various times, *e.g.* from 1990 until May 16, 2008 and from March 31, 2016 until January 24, 2018. Cysewski was also Chairman of the Board from 1990 until May 2008. Cysewski is a citizen of the state of Hawaii.

21.     **Nancy E. Katz**. Katz has been a Cyanotech Board member since October 2016 and sits on the Audit and Nominating and Corporate Governance Committees. Katz is a citizen of the state of California.

22.     **Walter B. Menzel**. Menzel has been a Cyanotech Board member since August 2013. Menzel is Chairman of the Compensation Committee and a member of the Audit Committee. Menzel is a citizen of the state of California.

23.   **David M. Mulder**.  Mulder has been a Cyanotech Board member since May 2016 and is Chairman of the Audit Committee.  Mulder is a citizen of the state of California.

24.   **David L. Vied**.  Vied has been a Cyanotech Board member since January 2015.  Vied sits on the Nominating and Corporate Governance and Compensation Committees.  Vied is a citizen of the state of California.

## DEFENDANTS' FIDUCIARY DUTIES

25.   Each officer and director of Cyanotech owes Cyanotech or its shareholders a continuing duty to exercise a high degree of care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Cyanotech's directors and officers complained of herein involves oppression and fraudulent misconduct – a knowing, intentional, and culpable violation of their obligations as directors of Cyanotech and the absence of good faith on their part for their duties to the Company and its shareholders.  The misconduct of Cyanotech's officers and directors has been ratified by Cyanotech's Board, which has failed to take any legal action on behalf of the Company against them.

26.   By reason of their positions as officers, directors, and/or fiduciaries of Cyanotech, and because of their ability to control the business and corporate affairs of Cyanotech, defendants owe Cyanotech and its shareholders fiduciary obligations

of candor, trust, loyalty, and care and are required to use their ability to control and manage the Company in a fair, just, honest, and equitable manner and to act in furtherance of the best interests of Cyanotech and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. In addition, as officers and/or directors of a publicly held Company, defendants have a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections, and forecasts, so as to fulfill their duty of candor and honesty to Cyanotech's existing shareholders, and so that the market price of Cyanotech's stock is based on truthful and accurate information.

27.     Defendants, because of their positions of control and authority as directors and/or officers of Cyanotech, were able to and did, directly and indirectly, control the wrongful acts complained of herein.  Because of their executive and directorial positions with Cyanotech, each of the defendants had access to adverse non-public information about the financial condition, operations, governance practices, business objectives and opportunities, and future business prospects of Cyanotech and were required to promptly and accurately disclose that information to the Company's shareholders and the financial markets, but did not do so.

28.     To discharge their duties, the directors of Cyanotech are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of Cyanotech. By virtue

of such duties, the officers and directors of Cyanotech were required, among other things, to:

(a)     Manage, conduct, supervise, and direct the business affairs of Cyanotech in accordance with the law (including U.S. securities laws and the Sarbanes-Oxley Act of 2002), government rules and regulations, and Cyanotech's charter and bylaws;

(b)     Neither violate nor knowingly permit any officer, director, or employee of Cyanotech to violate applicable laws, rules, and regulations;

(c)     Remain informed as to the status of Cyanotech's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with their duty of candor to the Company's shareholders;

(d)     Establish and maintain systematic and accurate records and reports of the business and affairs of Cyanotech and the procedures for the reporting of the Company's business and affairs to the Board, and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate, functioning system of internal legal, financial, and accounting controls, such that Cyanotech's financial

statements are accurate and the actions of its directors are in accordance with all applicable laws;

(f)     Exercise reasonable control and supervision over public statements to the securities markets and trading in Cyanotech stock by the officers and employees of Cyanotech; and

(g)     Supervise the preparation and filing by Cyanotech of any financial reports or other information required by law and to examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of Cyanotech and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

29.     During all times relevant hereto, each of the defendants occupied a position with Cyanotech or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Cyanotech and its operations, governance practices, business objectives and opportunities, finances, and financial condition.  Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding Cyanotech's business, practices, and finances had not been disclosed to and were being concealed from its shareholders and the public.  Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Cyanotech and to take any and all

action necessary to ensure that the officers and directors of Cyanotech did not act upon such privileged non-public information in a manner that caused the Company to violate the law.

30.     Defendants owe additional duties to Cyanotech and its shareholders through the Cyanotech Corporation Corporate Code of Conduct and Ethics ("Code of Ethics") and Board of Directors Code of Conduct ("Directors Code of Conduct").  According to the Company's most recent Proxy Statement:

> The Codes contain general guidelines for conducting the business of the Company consistent with the highest standards of business ethics, and is [sic] intended to qualify as a "code of ethics" within the meaning of Section 406 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder and as a "code of conduct" within the meaning of the Nasdaq listing standards.

Additionally, "[i]f we make any substantive amendments to or grant any waiver from such Codes relating to our Chief Executive Officer, Chief Financial Officer or other officer, we will disclose the nature of such amendment in a report on Form 8-K and amend the website disclosure."

31.     According to the Code of Ethics, "[a]ll Company employees (which for purposes of the Code includes all full-time, part-time, contract, and temporary employees) are required to abide by the Code, and all directors and independent contractors are required to abide by the Code to the extent that they are carrying out Cyanotech duties."  The Code of Ethics requires that the Company's officers and directors adopt a set of core values which explain that, among other things, "[a]s a

public corporation we are the guardians of our owners' investment. Consistent with the values above, we will strive to maximize the value of our owners' investment over time." Thus, the Code of Ethics explains that executives and directors "should be especially alert and sensitive to situations that might compromise your credibility, integrity or relationship with our customers, suppliers, shareholders, communities that we serve or your fellow employees."

32.     Similarly, the Code of Ethics requires officers and directors to submit accurate and truthful disclosures to the SEC. Specifically, the Code of Ethics states:

> Cyanotech is required to file various periodic reports with the Securities and Exchange Commission and other governmental agencies, and it is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all required periodic reports. No entry should be made on the books and records of the Company that intentionally hides or disguises the true nature of any transaction.

33.     Moreover, the Code of Ethics requires officers and directors to avoid conflicts of interest and to only make decisions that affect the Company based on the Company's best interests:

**VI.   Conflicts of Interest and Outside Employment**

> You are expected to dedicate your best efforts to Company business and to make decisions that affect the Company based on the Company's best interests, independent of outside influences.
>
> A conflict of interest occurs when your private interests interfere, or even appear to interfere, in any way with the interests of the Company as a whole. A conflict situation can arise when you take actions or have

- 16 -

interests that make it difficult, or appear to make it difficult, for you to perform your Company work objectively and effectively. You should never act in a manner that could cause you to lose your independence and objectivity or that could adversely affect the confidence in the integrity of the Company of our customers, suppliers, shareholders, fellow employees or the communities that we serve. Your obligation to conduct the Company's business in an honest and ethical manner includes the ethical handling of actual, apparent and potential conflicts of interest between personal and business relationships.

*     *     *

Where a conflict of interest affects Company directors or executive officers, they must make full disclosure of all facts and circumstances to the Compliance Officer who shall have the responsibility of informing and seeking the advance approval of the Audit Committee of the Cyanotech Board of Directors or the Chair of the Audit Committee (or in the absence of the Chair of the Audit Committee, any member of the Audit Committee that he or she designates for this purpose). Any such approval made by the Chair of the Audit Committee or his or her designee shall be reviewed by the Audit Committee at its next regularly-scheduled meeting.

34.     The Code of Ethics also requires all executives and directors to ensure that they do not take any actions that usurp a corporate opportunity. The Code of Ethics states:

### X.     Corporate Opportunities

We owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. You may not use Company property, information or position for personal gain, nor may you compete with the Company.

If you learn of a business or investment opportunity through the use of Company property or information or your position at the Company or otherwise, you may not participate in the opportunity or make the investment without the prior approval of the CEO or the Compliance Officer after full disclosure of all material terms for any

- 17 -

planned activities.  Company executive officers must obtain advance approval of the Audit Committee.  Such an opportunity should be considered an investment opportunity for the Company in the first instance.

Directors' duties with respect to corporate opportunities are somewhat different.  A director who wishes to participate in a business opportunity that reasonably relates to Cyanotech's business should disclose the opportunity to the Board of Directors.  If the Board of Directors determines that the Company does not have an actual or expected interest in the opportunity, then the director may participate in the opportunity, provided that the director has not wrongfully utilized the Company's resources in order to acquire the opportunity.

35.    According to the Code of Ethics, the Company's employees and directors are prohibited from engaging in insider trading.  The Code of Ethics states that "[y]ou are prohibited by Company policy and the law from buying or selling Cyanotech Common Stock or other securities of the Company at a time when you are in possession of material nonpublic information."  Moreover, the Company's insider trading policies are distributed to all employees and directors and include specific additional rules for directors and officers:

In order to promote compliance with the insider trading laws, Cyanotech has adopted an Insider Trading Policy, which is applicable to all directors and employees and is included as part of the Cyanotech Employee Handbook.  The Insider Trading Policy also lists additional restrictions relating to securities trading by Company directors, executive officers and certain other key Company employees.

36.    The Company has also adopted the Directors Code of Conduct, which requires directors to conduct business "in accordance with the highest standards of business ethics and in compliance with applicable laws, rules, and regulations."

The Directors Code of Conduct explains that every director must: "(i) represent the interests of the stockholders of Cyanotech Corporation; (ii) exhibit high standards of integrity, commitment and independence of thought and judgment; (iii) dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties; and (iv) comply with every provision of this Directors' Code."

37.    The Directors Code of Conduct contains additional duties specific to the Company's Board and states, in relevant part:

### Conflicts of Interest

Directors must avoid conflicts of interest.  A conflict of interest occurs when an individual's private interest interferes in any way with the interests of this company or any of its subsidiary and affiliated companies . . . .

\*      \*      \*

### Use of Corporate Information, Opportunities and Assets

Directors may not compete with the Company, or use opportunities that are discovered through the use of Company property, Company information or position, for their personal benefit or the benefit of persons or entities outside the Company.  No Director may improperly use or waste any Company asset.

\*      \*      \*

### Compliance with Laws, Rules and Regulations

The Company requires strict compliance by all its Directors with applicable laws, rules and regulations.  These include federal and other securities laws, including insider trading laws, and the Company's insider trading compliance policies.

### Fair Dealing

Directors must deal fairly with each other and with the Company's employees, customers, suppliers and competitors.  No Director may take unfair advantage of the Company's other Directors, or of the Company's employees, customers, suppliers, or competitors through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

### Accountability

The Directors' Code referred to herein is mandatory and applies to all Directors, who are accountable for compliance with the Directors' Code.

Directors should communicate any suspected violations of this Directors' Code promptly to the Chair of the Nominating and Governance Committee and the Chairman of the Board.  Suspected violations will be investigated by or at the direction of the Board or the Nominating and Governance Committee, and appropriate action will be taken in the event that a violation is confirmed.

### Waiver

Any waiver of any provision of the Directors' Code may be made only by the Board or by the Nominating and Governance Committee, and must be promptly disclosed to the Company's stockholders as required by applicable law or Securities Exchange Commission or stock exchange regulations

38.     The defendants breached their obligations under the Company's Code of Ethics and Directors Code of Conduct, including fiduciary duties, corporate opportunity, and insider trading.  In addition, defendants have breached their obligations by allowing defendant Davis to file false and misleading disclosures with the SEC that omitted the fact that defendant Davis arranged and financed RSF's purchase of VitaeLab's 9.7% share of Cyanotech common stock for the

benefit of defendant Davis and his family.  The false and misleading filings also omitted the fact that defendant Davis was in *de facto* control of the shares purchased by RSF because they were purchased at his instruction, with funds he provided, and are held in a Donor Advised Fund that defendant Davis created and *de facto* controls.

39.   Additionally, defendants breached their fiduciary duties and their obligations under the Code of Ethics by failing to inform shareholders that defendant Davis appears to be using his so-called charitable non-profit entities to gain control of the Company while avoiding paying the taxes to state and federal authorities that would be required if the true nature of the purported charitable entities was exposed.  Such illegal actions subject the Company to regulatory investigations and/or other related litigation.  Each defendant also violated the Code of Ethics by failing to stop defendant Davis from secretly financing RSF's purchase of Cyanotech stock (upon defendant Davis's instruction and for defendant Davis's benefit) while defendant Davis was in possession of material inside information.

40.   Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to: (i) take actions to the detriment of shareholders generally; (ii) misrepresent its financial results and prospects, as detailed herein; (iii) misrepresent its ownership and control persons; (iv) conceal the agenda of such control persons; and (v) fail to prevent the defendants from

taking such illegal actions. Each defendant participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings, and reports to Cyanotech shareholders. In addition, as a result of defendants' illegal actions and course of conduct, the Company has been subjected to lawsuits that allege violations of the federal securities laws. As a result, Cyanotech has expended and will continue to expend significant sums of money. Moreover, these actions have irreparably damaged Cyanotech's corporate image and goodwill.

## AIDING AND ABETTING AND CONCERTED ACTION

41. In committing the wrongful acts set forth herein, defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct detailed in this Complaint giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

42. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs set forth in this Complaint. In taking such actions to substantially assist the commission of the wrongdoing, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of

that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

43.   Cyanotech is a publicly traded corporation that produces the supplements spirulina and astaxanthin for both wholesale and retail markets.[1] Cyanotech's operations are based in Hawaii, where the combination of high temperatures and low rainfall are optimal for microalgae cultivation.[2]   The corporation was formed through reverse merger with an inactive public shell corporation and thus has been a public Company since its inception.[3]

44.   Defendant Davis became Cyanotech's largest shareholder in 2002.[4]   In 2003, the Company announced that "Mr. Davis was appointed to the board of Directors of the Company in March 2003 subsequent to his acquisition of $1,250,000 of subordinated convertible debentures of the Company in September

---

[1]   *See Our History*, Cyanotech, https://www.cyanotech.com/our-history/ (last visited Aug. 22, 2019).

[2]   *Our Purpose*, Cyanotech, https://www.cyanotech.com/our-purpose/ (last visited Aug. 22, 2019).

[3]   *Our History*, *supra* note 1.

[4]   *See* Michael A. Davis, Acquisition of Ownership of Cyanotech Corp. by Passive Investor (Schedule 13G) (Oct. 8, 2002), https://www.sec.gov/Archives/edgar/data/768408/ 000095014902002129/f84987sc13g.htm.

2002."[5]   Davis became a member of Cyanotech's Audit Committee, Nominating and Corporate Governance Committee, and Compensation and Stock Option Committee,[6] before eventually being appointed Chairman of the Board on April 13, 2011.[7]

45.   For years, despite maintaining his position as Cyanotech's largest shareholder and becoming an active member (indeed, Chairman) of the Board, Davis continued to improperly file Schedule 13Gs with the SEC, the form reserved for "passive" investors, regarding his investment in Cyanotech.[8]   Shortly after defendant Davis was appointed Chairman of the Board, he initiated a scheme to secretly gain a controlling share of the Company.   As part of the scheme, defendant Davis began taking actions to alienate other shareholders who might acquire

---

[5]   Cyanotech Corp., Proxy Statement (Form SC 14A) (July 16, 2003), https://www.sec.gov/Archives/edgar/data/768408/000104746903024270/a2114570 zdef14a.htm.

[6]   Cyanotech Corp., Proxy Statement (Form SC 14A) (July 23, 2010), https://www.sec.gov/Archives/edgar/data/768408/000110465910039220/a10-14180_1def14a.htm.

[7]   Cyanotech Corp., Proxy Statement (Form SC 14A) (July 20, 2011), https://www.sec.gov/Archives/edgar/data/768408/000110465911039820/a11-18571_1def14a.htm.

[8]   *See, e.g.*, Cyanotech Corp., Amended Statement of Acquisition of Ownership (Form SC 13G/A) (Feb. 5, 2016), https://www.sec.gov/Archives/edgar/data/768408/000119312516452585/ 0001193125-16-452585-index.htm.

sufficient shares to challenge his control of the Company. Working in concert with defendant Davis on this scheme and providing the vehicle used to surreptitiously acquire effective voting control over the Company was RSF.

46.    In early 2011, a shareholder, VitaeLab, approached the Company's top executive, Brent Bailey, seeking to sell VitaeLab's holdings. VitaeLab owned 9.7% of the Company's common stock. Then-CEO Bailey (who was also a director at that time) properly alerted defendant Davis (the Company's Chairman of the Board) about VitaeLab's outreach. Despite the significant nature of VitaeLab's communication to the Company, upon information and belief, the other members of Cyanotech's Board never discussed VitaeLab's outreach.

47.    Instead, on May 27, 2011, RSF filed a Schedule 13G with the SEC stating that it held 659,366 shares of Cyanotech common stock, approximately 12.23% of the Company's stock. The filing stated that RSF's holdings were not part of a "group" and certified that:

> [T]he securities referred to above were acquired and are held in the ordinary course of business and were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect.

The Schedule 13G was signed by RSF's Chief Financial Officer ("CFO") at the time, Gary Schick.

48.    On May 31, 2011, VitaeLab filed a Schedule 13D/A with the SEC stating that "[o]n May 17, 2011, the Reporting Persons sold all of the shares of Common Stock of the Issuer they owned in a privately negotiated transaction." Nowhere did either RSF or VitaeLab disclose that defendant Davis, the largest shareholder and Chairman of the Board of Cyanotech, was behind the entire transaction, having arranged and financed it through a Donor Advised Fund that he created and *de facto* controlled.  All the while, defendants caused the Company to issue numerous SEC filings that continued to omit the fact that defendant Davis was leading a secret "group" that had assumed voting control over Cyanotech.

49.    Worse yet, defendant Davis covertly helped himself to the VitaeLab stock while he was in possession of material inside information.  Upon information and belief, defendant Davis purchased VitaeLab's shares via RSF after he and the other defendants knew about Cyanotech's annual financial results and future prospects, but before this information was released to shareholders.  Specifically, defendant Davis effected the purchase of the VitaeLab's Cyanotech shares through his secret RSF proxy on May 17, 2011, and the Company filed its financial results for the fiscal year ended March 31, 2011 on June 23, 2011.  When defendant Davis caused RSF to purchase VitaeLab's Cyanotech shares, the trading price was $3.38 per share.  Two months later, on August 17, 2011, Cyanotech shares traded at $4.38 per share and by the end of the year were trading at $6.95 per share.  Thus,

defendant Davis's illicit gambit resulted in nearly $2 million in unrealized insider trading profits.

50.    It was not until Cyanotech's third largest shareholder started investigating the questionable disclosures that the truth was revealed.  On May 6, 2016, after discovering defendant Davis's egregious conduct and scheme to secretly gain control of Cyanotech, Meridian sent Cyanotech's interim CEO a letter spelling out defendant Davis's scheme to secretly gain control of the Company.  Meridian requested that the then-CEO (who was also a director) share the letter with the Chairman of the Company's Audit Committee and then for these two directors to consider engaging legal counsel independent of defendant Davis to consider the letter's content and how to proceed in light of the substantial wrongdoing alleged in the Meridian letter.  Rather than take appropriate action to protect the Company from defendant Davis's malfeasance, defendants took actions that had the effect of protecting defendant Davis.  Only 11 days following receipt of Meridian's letter, Ralph Carlson, the Chairman of the Board's Audit Committee, and the person charged with the greatest responsibility for enforcing applicable laws, regulations, and conduct, including Cyanotech's Code of Ethics, resigned.

51.    Given defendants' apparent refusal to take appropriate action with respect to defendant Davis's egregious conduct, Meridian determined it was necessary to pursue external legal remedies.  Accordingly, Meridian filed a lawsuit

on May 24, 2016 seeking to expose defendant Davis's scheme and the Board's inaction after being alerted to it by Meridian's May 6, 2016 letter.  Thereafter, defendants caused the Company to fight Meridian's lawsuit and continued to hide the truth from investors.  This included conducting a purported investigation by a special committee of the Board utilizing an outside law firm.  While the special committee reported its findings via a Form 8-K on September 9, 2016, telling shareholders that it had found no material issues relating to defendant Davis's activities, it subsequently made clear that the actual content of the outside law firm's report was protected content and thus immune from potential legal discovery. Meridian subsequently dropped Cyanotech from the lawsuit in order to save the Company from additional expenditures.  Ultimately, Meridian and the remaining defendants reached a non-financial settlement that required defendant Davis the file a Schedule 13D – the type of filing that is required when an investor is investing in a Company for purposes of controlling it or if they are seeking a change of control.

52.    When Davis finally provided the additional information required by the corrected Schedule 13D, the purpose of Davis's obfuscatory reporting practices was formally revealed. By colluding with RSF, the non-profit organization he had recruited for this purpose, Davis had been able to hide the fact that he had accumulated as much as 33% of Cyanotech's outstanding shares, a control block

giving him voting control over the Company and its Board.[9]  The Schedule 13D that was finally elicited from Davis years after this malfeasance (and after a significant amount of Cyanotech's funds were spent on legal fees denying the allegations of misreporting[10]) provided details regarding Davis's arrangement with RSF.  Moreover, Davis admitted that he and RSF formed a "group" under §13(d)(3) of the Securities Exchange Act of 1934, which states that:

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purpose of acquiring, holding, voiding or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons.

According to Davis's own SEC filings:

> RSF became a shareholder . . . when Skywords [one of Davis's tax-deductible entities] transferred shares . . . to RSF as an unrestricted gift. . . .
>
>     In 2011 Davis learned that a significant Cyanotech customer and shareholder wished to sell its shares . . . .  He put the shareholder in

---

[9]   Cyanotech Corp., Statement of Acquisition of Ownership, filed by Michael Davis (SC 13D) (Dec. 20, 2016) ("Davis 13D Dec. 20, 2016"), https://www.sec.gov/Archives/edgar/data/768408/ 000149315216016041/sc13da.htm; Cyanotech Corp., Proxy Statement (SC 14A) (Nov. 4, 2016), https://www.sec.gov/Archives/edgar/data/768408/000143774916041075/cyan201610 28_def14a.htm (showing that Michael A. Davis owns 19.5% and RSF owns 13.6%, for a total of 33.1%).

[10]   Andrew Gomes, *Legal fees inflate Cyanotech's loss*, Honolulu Star, Aug. 16, 2016, https://www.staradvertiser.com/2016/08/16/business/legal-fees-inflate-cyanotechs-loss/.

touch with RSF [and] donated approximately $2.5 million to RSF with the understanding that RSF may use some or all of the funds to attempt to purchase shares . . . .  Davis understands that RSF purchased shares . . . in May 2011 using approximately $1.7 million of the funds from the Skywords grant.[11]

53.     Davis has, therefore, admitted under oath that he bought and/or donated all of the Cyanotech shares that RSF owns.  Even more damning, however, is his admission that:

> The shares of Common Stock owned by RSF are held by RSF pursuant to a Living Capital Fund ("LCF") agreement for the benefit of Ginungagap. . . .
>
> . . . Mr. Davis serves as the president of Ginungagap and as the director of Ginungagap appointed by Skywords.[12]

54.     The LCF is a Donor Advised Fund ("DAF") created and controlled by Davis.  Davis formed the LCF in late 2010 and immediately began using it to hold shares of Cyanotech stock, some of which he transferred to the LCF and some which he caused RSF to purchase, with money he provided for that purpose.  All shares in the LCF are held for the benefit of an entity that he created and controls, but use of the LCF provided Davis with a mechanism to keep secret the true extent of his holdings in the Company and the source of funds used by Davis to acquire control over the Company.

---

[11]   Davis 13D Dec. 20, 2016.

[12]   *Id.*

55.     Any pretense that RSF had or has any interest in owning the shares for its own benefit is demonstrated fallacious by reference to RSF's public report in 2010, repeated multiple times since, that it does not believe in the public markets and that therefore "RSF divest[ed] from all public equities and redirect[ed] capital to investments more closely aligned with its values."[13]   By its own contemporaneous account, RSF has no interest, and does not invest, in public companies, nor does it consider its ownership of Cyanotech's shares to be its own investment.

56.     Outside of the DAF mechanism effected with RSF, Davis has been careful to keep his direct reported ownership of Cyanotech under 20%. Maintaining control of the Company while purchasing shares that would take his holdings over 20% is likely part of defendant Davis's motivation for disguising his control over RSF's shares.   The 20% figure is important to Davis's operations, because a significant portion of the shares that he reports owning are owned via tax-deductible organizations that he controls, this includes the Michael Arlen Davis Charitable Lead Annuity Trust and Skywords Family Foundation.[14]   The Internal

---

[13]   Molly Abrams, *A History of RSF Social Finance*, RSF Social Finance, (Sept. 25, 2014), https://rsfsocialfinance.org/ 2014/09/25/history-rsf-social-finance/.

[14]   Davis 13D Dec. 20, 2016.   Skywords also provides funding for Davis's non-profit filmmaking entity, Canobie Films, Inc.   *See* Skywords Family Foundation, 2014 Form 990 http://990s.foundationcenter.org/990pf_pdf_archive/201/201247525/201247525_201412_99 0PF.pdf (last visited Aug. 21, 2019).

Revenue Code treats a charitable foundation's ownership of over 20% of a business enterprise as an "excess business holding" under §4943 and provides harsh penalties in the form of excise taxes.[15]   Davis is thus trying to avoid what is in effect a statutory ban on control of a business enterprise by a charity by distributing his shares of Cyanotech among several charities, none of which individually owns more than 20%.

57.    Davis's connections to RSF go back over a decade; their first venture together was a "biodynamic farm[ing]" project called Filigreen Farm.  Filigreen Farm is owned by Yggdrasil Land Foundation, a "supporting organization" to RSF Social Finance.[16]   The farm is funded by Ginungagap.[17]   Yggdrasil's and Ginungagap's odd names both come from Norse mythology.  The connection here is Rudolph Steiner, a late nineteenth-century polymath and the namesake of RSF; according to RSF Social Finance's website, Steiner "gave a series of lectures on

---

[15]  *Taxes    on    Excess    Business    Holdings*,  IRS  (June   5,   2019), https://www.irs.gov/charities-non-profits/private-foundations/taxes-on-excess-business-holdings.  Section 4943 provides an initial 10% tax on the value of the excess holdings and an additional 200% tax if the excess holding is not disposed of by the end of the taxable period.

[16]  *Yggdrasil Land Foundation*, RSF Social Finance https://rsfsocialfinance.org/person/ yggdrasil-land-foundation/. (last visited Aug. 22, 2019).

[17]  *See, e.g.*, Ginungagap Foundation, 2014 Form 990 (last visited Aug. 22, 2019), http://990s.foundationcenter.org/ 990_pdf_archive/201/201402909/201402909_201412_990.pdf.

economics, which served as the framework of ideas that inspired the founding of RSF."[18]   Steiner is also known for creating the Waldorf education system and for his mysticism and fascination with Norse mythology, which is taught to all Waldorf students in fourth grade.[19]   Furthermore, RSF Social Finance announces on their website that, consistent with Steiner's teachings, their investment strategy is "return agnostic, regardless of risk.   We do not seek market-rate returns as a primary goal."[20]   This is all well and good for a charity, but is obviously not a desirable attitude for a member of a shareholder group (including the Chairman of the Board) that controls a widely owned public corporation such as Cyanotech.

58.   Indeed, only a "return agnostic" investor could be happy with Cyanotech's performance under Davis's stewardship.   Despite enjoying a market leader position for retail sales of astaxanthin and significant growth potential, Cyanotech **has drastically underperformed the market over the last fifteen years**,

---

[18]   *About Us*, *Inspiration*, RSF Social Finance, https://rsfsocialfinance.org/our-story/ (last visited Aug. 22, 2019).

[19]   *See, e.g.*, *Books: Norse Mythology (Waldorf Education Resources)*, The Online Waldorf Library, https://www.waldorflibrary.org/books/3/view_bl/61/fourth/593/norse-mythology-waldorf-education-resources (last visited Aug. 22, 2019).

[20]   *Mission-aligned investment portfolio*, RSF Social Finance, https://rsfsocialfinance.org/give/ donor-advised-funds/liquidity-portfolio/ (last visited Aug. 22, 2019).

coincident with Davis's control.[21]  The Company's stock is currently trading below $3.00 per share, below even where it was fifteen years ago.[22]  Part of this poor performance has been precipitated by the unexplained firings of successful CEOs at key moments in the Company's history, the most recent being Mawae Morton's ouster as CEO, effective May 22, 2019.[23]

59.   Tracking Cyanotech's strong pattern of executive turnover can begin on March 1, 2010, when the Company announced that Andrew Jacobson had been removed as Cyanotech's CEO.  As CEO, Mr. Jacobson had substantially improved the Company's financial results and prospects.  As demonstrated below, Mr. Jacobson caused the Company to perform substantially above the NASDAQ's overall performance:

---

[21]  *See* Cyanotech Corp., Amended Statement of Beneficial Ownership, filed by Meridian OHC Partnership, LP (Form SC 13D/A) (July 25, 2016), https://www.sec.gov/Archives/edgar/data/ 768408/000144586616002404/meridian13d05252016.htm.

[22]  *Cyanotech Corporation*, Yahoo! Finance https://finance.yahoo.com/quote/CYAN/history? period1=1087455600&period2=1087455600&interval=1d&filter=history&frequen y=1d (last visited Aug. 28, 2019).

[23]  Cyanotech Corp., Current Report (Form 8-K) (June 3, 2019), https://www.sec.gov/Archives /edgar/data/768408/000143774919011624/cyan20190606g_8k.htm.



60.     While shareholders were notified of Mr. Jacobson's removal as CEO,

defendants did not provide any explanation for why the Company's very successful

chief executive had been removed.

61.     Next, Brent Bailey was appointed as a Cyanotech director on

November 8, 2010, and as its President and CEO on January 11, 2011.  Mr. Bailey

brought a wealth of experience to the Company.  Indeed, Mr. Bailey previously

served as President and Chief Operating Officer of Pharmavite LLC, a $500-million

subsidiary of Otsuka Pharmaceuticals Company, where he and his team drove the

Nature Made brand to the #1 position in mass market nutritional supplements. Mr. Bailey did not disappoint as CEO of Cyanotech and drove substantial growth, both in the Company's operations and investor interest in the Company, during his tenure as represented by the chart below:



62.   Given CEO Bailey's success in substantially outperforming the NASDAQ during most of his tenure, stockholders were shocked by the news that Mr. Bailey had been forced out of the Company. Just as before, shareholders were informed of CEO Bailey's departure from the Company, but without explanation.

Privately, it was defendant Davis himself that informed CEO Bailey that his contract would not be renewed.  Upon information and belief, CEO Bailey's termination as CEO prevented him from completing the vesting necessary to exercise employee incentive stock options he had been earning during his tenure – options that accounted for more than 9% of the Company's outstanding stock – an ownership stake, particularly when combined with the ownership of other stockholders outside the Davis "group," had potential to threaten Davis's continuing control over the Company.

63.     More recently, defendants forced out the Company's Chief Operations Officer ("COO"), ending the career of another significant contributor to the Company's business.  On August 6, 2014, Gerard "Gerry" Watts was hired as COO in order to improve the Company's agricultural processes, improve its supply chain and streamline its overall operations.  On information and belief, however, the Board, led by defendant Davis, regularly refused to fund the operational improvements advocated by COO Watts.  The predictable result of the Board's consistent refusal was an extended period of operational stagnation.  However, after overseeing long-delayed but substantial improvements to Cyanotech's operations, Mr. Watts was forced out of the Company without explanation to shareholders on November 6, 2018.  The Company's performance with Mr. Watts as COO, as compared to the overall NASDAQ, is demonstrated in the chart below:



64.    Continuing into the present year, after terminating the Company's long-time CFO, Jole Deal, in January 2019, defendants next terminated Cyanotech's most recent CEO, Mawae Morton.   Mr. Morton was named Cyanotech's President in July 2017 and promoted to CEO and named a director on January 24, 2018.  On April 26, 2019, the Company announced without explanation – just as with all of the other CEOs – that Mr. Morton had resigned as CEO and as a director of the Company (effective May 22, 2019).

65. Indeed, the revolving door in Cyanotech's executive suite has severely dampened the Company's performance and financial results. It appears that executives successfully managing the Company's prospects in a good faith effort to meet their fiduciary obligation to maximize shareholder value are particularly susceptible to dismissal. This apparent effort to slow growth and restrain the Company's performance can be seen in the following chart that compares Cyanotech's performance to NASDAQ overall:



66.     It appears that the common thread woven through all of these events is defendant Davis's desire to regularly turnover management in order to maintain control of the Company, to allow no challenges to his leadership and agenda, and to allow him to remain in a position where he can turn away other investors who have invested in Cyanotech based on its strong performance and growth prospects.

67.     The result of defendant Davis's actions is to put his personal interests above all other corporate interests.  The failure of defendants as a group to take the necessary actions to correct this misconduct, as it occurs or as it is subsequently discovered, has resulted in significant harm to the Company and its other stockholders.

68.     Tracing defendant Davis's agenda to handicap the Company's performance and to ward off any investor or executive capable of challenging his continued control over the business starts with VitaeLab.  In June 2008, VitaeLab – a large European supplements company and Cyanotech customer – filed two Schedule 13Ds disclosing that it had acquired 9.7% of Cyanotech's outstanding stock.  VitaeLab's notifying shareholders of its large and aggressive purchases of Cyanotech stock via a Schedule 13D filing communicated that it was not seeking a passive investment, but rather, that it intended to influence Cyanotech's operations or governance.  These purchases were made during the tenure of then-CEO

Jacobson, who would have been informed of the VitaeLab purchases and would be the point person during discussions with VitaeLab.

69.    On information and belief, defendants first reacted by terminating CEO Jacobson, the person to whom VitaeLab would have directed its communications and interest in the Company.  Next, shortly after the March 1, 2010 surprise, and unexplained, announcement that CEO Jacobson was leaving the Company, defendant Davis began a series of open-market purchases of Cyanotech stock – his first purchases since 2002.[24]

70.    Next, on October 26, 2010, then Chairman of the Board Gregg Robertson resigned and, on April 21, 2011, defendant Davis was named the new Chairman of the Board.

71.    Shortly after news of Davis's elevation to Chairman broke, VitaeLab contacted the Company's then-CEO, Brent Bailey, and communicated its desire to sell its stake in the Company.  Once CEO Bailey informed defendant Davis of VitaeLab's desire to sell its stake, Davis began his secret gambit to acquire the shares in furtherance of his continuing control agenda.  Moreover, as defendant Davis's purported non-profit family foundations and other entities were nearing the 20% threshold at which IRS penalties are assessed, defendant Davis began secretly

---

[24]  These purchases started on or around August 17, 2010, and were disclosed on Form 4s filed with the SEC.

donating Cyanotech shares and providing funds for the purchase of Cyanotech shares to RSF as described herein. Ultimately, RSF purchased the VitaeLab block on May 17, 2011, and filed a Schedule 13G with the SEC reporting the event. Upon information and belief, the Board never discussed how the Company should deal with the VitaeLab's offer to sell its shares. As described above, shareholders only learned of defendant Davis's relationship with RSF, and thus his secret creation and financing of the DAF, and his gambit to gather control over a substantial percentage of Cyanotech's outstanding common stock in 2016, after plaintiff initiated a substantial investigation and alerted shareholders to the truth.

72. Next, defendant Davis orchestrated the March 31, 2016 departure of then-CEO Bailey without any explanation to shareholders. Upon information and belief, CEO Bailey's termination as CEO prevented him from exercising stock options he had been vesting during his tenure – options that accounted for more than 9% of the Company's outstanding stock – thereby eliminating yet another potential threat to Davis's control over Cyanotech.

73. Indeed, defendant Davis's repeated efforts to stop Cyanotech from growing and expanding, and thereby maximizing shareholder returns, appear to be designed to deter any threat to defendant Davis's control of the Company – including from plaintiff Meridian, who is the Company's third largest shareholder behind defendant Davis and RSF.

74.     One of the motivations for defendant Davis's inexplicable actions appears to be that, by keeping control in his hand, defendant Davis is able to use his extensive network of purported charitable organizations to benefit and enrich himself.   As described herein, defendant Davis exerts *de facto* control of the Company through the voting power of his long-surreptitious stock holdings and his position as Chairman of the Board.   Moreover, upon information and belief, defendant Davis has repeatedly, exercised that power via his practice of establishing a revolving door in the Company's executive suite, exercised direct control over the Company's day-to-day operations and has used this control to further his own Rudolf Steiner-inspired ideas with respect to corporate growth and profit incentives.

75.     According to the website whistlebl0wer.com, in a report detailing its research, including conversations with a party reporting to have filed federal whistleblower complaints relating to the corporate and governance issues discussed herein, defendant Davis operates in such an unconventional manner and has created his web of purported charities and non-profit entities not only to further his personal interests, but also to effect the transfer of wealth designated for charitable purposes by his late father to the benefit of himself and his family members.   The website

contends that, along the way, defendant Davis made sweetheart deals to benefit

RSF executives who were helping to implement his scheme:[25]

## PRIVILEGED BEGINNINGS

The fraud dates back to the terms of Davis's huge inheritance from his father Leonard Davis, the owner of Colonial Penn Life Insurance and co-founder of AARP.

"Leonard died in early 2001 and left him a large charitable lead annuity trust requiring him to donate the money to qualified charities," the whistleblower said, noting the trust has distributed at least $75 million already. "He set up a whole network of charities to capture the money for himself."

\*        \*        \*

To do so, Davis created a non-profit called Ginungagap Foundation. Under a different spelling, Ginnungagap, the seemingly nonsense name, refers to Norse mythology's Eddaic text, the Gylfaginning. Ginnungagap is the primordial void – the "gaping abyss" or "yawning void" – since used to name a giant black hole on the sun.

In this case, Ginungagap, according to the whistleblower, could represent both the vastness of Leonard Davis's estate, and the lengths to which Michael Arlen Davis was prepared to sidestep the terms of his inheritance for personal gain, harming employees and shareholders of Cyanotech and the executives of RSF in the process, never mind state and national tax coffers bereft of his fair contribution.

"Think of Davis as a predator who corrupts people around him with his money," the whistleblower said. "I think his father, Leonard, must have understood that by limiting his inheritance to charities only,

---

[25]  *Cyanotech ($CYAN) Chairman Michael Arlen Davis, Rudolf Steiner Foundation Execs Linked in CA Vineyard Tax Fraud; Whistleblower's IRS, SEC Claims Support $80MM Case Against Davis,* Whistleblower (Oct. 23, 2018), http://whistlebl0wer.com/cyanotech-michael-arlen-davis-rudolf-steiner-foundation/.

because Davis's brother, Alan, who appears to be entirely above board, seems to have had no restrictions imposed on his share."

"Ginungagap is nothing but a shell pass-through entity. It has no charitable operations of its own, no W-2 employees.  Complete fraud used as a blocking entity for massive private inurement."

The board of Ginungagap is made up of two RSF executives, including former chairman Mark Finser, and Davis, its president.

FILIGREEN FARM

Filigreen Farm LLC was created by Davis, who then donated the entity to Ginungagap Foundation, the non-profit he created and controls, which, in turn, is completely funded by Davis-family vehicle Skywords Family Foundation.

The whistleblower calculated that 97% of the charitable donations made by the Skywords Family Foundation from 2010 to 2015 were made to entities that financially benefit Davis, his family and friends – the ultimate IRS non-profit "no-no."  These include the winery, a documentary film Company run by Davis and his wife and the RSF-related Marin Waldorf School, where Davis' children were students.

Ginungagap's IRS 990 filings from 2003 to 2015 show that 92% of reported expenses went to "Filigreen Farm Project Costs."

The 87 acres of land under Filigreen Farm, in the fertile Anderson Valley, in Mendocino, California, are owned by the nonprofit Yggdrasil Land Foundation, an affiliate of Rudolf Steiner Foundation.  From the same roots as Ginnungagap, Yggdrasil is an immense mythical tree that connects the nine worlds in Norse cosmology.

The symbolism could be their downfall – at least when it comes to determining who was the mastermind behind the scam: RSF's Yggdrasil formed in 2000, back dated from 2001, and Davis' Ginungagap was formed in 2003, in California, then moved to Delaware in 2005.

In 2004, Yggdrasil agreed to lease all 87 acres to Filigreen Farm LLC for $15,000 annually. For 30 years.

A local real estate appraiser for area vineyards contacted by the whistleblower laughed at that valuation, estimating the true market value – per acre – at $6,000 – per month.

The terms of the lease should be closer to $6.2 million per year, not $15,000.

Who benefits from this 99.8% rent discount are the families that enjoy the bucolic surroundings, run Filigreen Farm, and drink its wine.[26]

76.    Indeed, the website conducted an extensive investigation that included the following chart describing the web of purported charities and non-profits created by defendant Davis, but really designed to benefit Davis personally:



---

[26]   *Id.*

77.     Despite being alerted no later than May 6, 2016 to defendant Davis's scheme to secretly control Cyanotech, defendants have failed to take action to stop Davis from controlling the day-to-day operations at the Company and working to turn other shareholders away.  Defendants' fiduciary failures have now apparently subjected the Company and defendant Davis to numerous whistleblower complaints filed with, and likely investigations involving, the IRS and the SEC.  News media coverage of the whistleblower complaints and their descriptions of Cyanotech's "shady" internal operations, governance practices, and leadership have become rampant.  For example, defendant Davis caused the Company to fire its longtime Hawaiian corporate law firm and replaced it with Farella Braun & Martell LLP – the same law firm representing defendant Davis's so-called charitable foundations.  Thus, Farella Braun & Martell has a conflict of interest whereby the firm is truly loyal to defendant Davis for his foundation work instead of its ancillary (although likely very lucrative, due to the matters discussed herein) client, Cyanotech.  The defendants on the Board have done nothing to stop defendant Davis's ongoing abuses of the Company to the detriment of shareholders.

78.     According to whistlebl0wer.com, "Davis is accused in multiple SEC and IRS filings and lawsuits for cheating on his taxes using a web of non-profits to

illegally control a 32% stake in the Company, beyond the IRS limit of 20% for one

non-profit foundation."[27]   The article goes on to explain:

> The whistleblower, a retired executive and long-time shareholder of the stock, has joined a chorus of disgruntled investors tired of Davis, beyond the legal questions over ownership of his stake.

> Revolving-door management, the hiring of auditors and lawyers with conflicts of interests in favor of Davis and other poor governance shenanigans have compromised the company's ability to produce microalgae to meet strong market demand for its products, they believe.

> On social media, the whistleblower asked:

> "Why would Nasdaq: $CYAN chairman Michael A. Davis fire the PUBLIC Company's legacy law firm and install his personal #tax law firm instead?  I'm not accusing Davis' lawyer (whose name is on every Davis #nonprofit tax return) of illegal activity. https://www.davisnonprofitabuse.com #IRS."

That frustration and anger at Davis is palpable from the comments by shareholders on the online fora.  After the annual meeting in August, "Oldwise" wrote on Yahoo's $CYAN forum:

> "Good news!  The annual meeting votes are in, and it is great to see that shareholder disgust for Michael Davis and his lap dog toadies has not abated.

> Davis led the pack with the most negative votes, David L. Vied, the Korn Ferry headhunter that votes to terminate executives so that he can earn a fee finding their replacement, came in with the second worst tally.  Very interesting new development, Grant Thornton received more 'withhold' votes than anyone on the board.

---

[27]  *Whistleblower Calls For Removal of Cyanotech ($CYAN) Chairman Michael Arlen Davis; Promising Future of BioAstin Microalgae Vitamin Biz Curtailed By Tax Cheat*, Whistleblower (Oct. 23, 2018), http://whistlebl0wer.com/whistleblower-calls-for-removal-of-cyanotech-cyan-chairman-michael-davis-promising-future-of-microalgae-curtailed-by-tax-cheat/.

The way I read this is that the company's auditor is being sent a message that it too can be held responsible for all the 'shady' things happening inside this public company.  Keep up the pressure honest shareholders – I believe I can hear the bell tolling.  And, I cannot wait to see what this company will do when it is run for the benefit of its public shareholders and not to conform with Davis' wingbat anti-growth religion."

The "anti-growth" comment refers to the Davis alliance with the Rudolf Steiner Foundation, a de-facto holder of a third of his stake via a Donor-Advised Fund structure.

The involvement of RSF Social Finance – a San Francisco based ethical investment group, which also owned a bank, since sold to Amalgamated, that was a major lender to Cyanotech, and a partnership between Davis and RSF in a vanity vineyard in California disclosed by the whistleblower – has muddied the waters around the management and the stock.

Investors who believe in the company's actual business prospects want to see Davis gone.

\*       \*       \*

## FIGHT FOR SHAREHOLDER VALUE

Cyanotech farms microalgae in a 90-acre facility in Kona, Hawaii.

Incorporated in 1983, Cyanotech sells Hawaiian BioAstin natural astaxanthin, a dietary antioxidant and nutraceutical, and Hawaiian Spirulina Pacifica, a dietary supplement and source of antioxidant carotenoids.

Cyanotech today is valued at about $19 million, with shares trading at $3.29, near their low in the past year of $3.22 and 40% below a high of $5.77.  The stock was trading close to $10 per share in 2015.

The whistleblower said he hoped to expose Davis's actions and that he believed removing him from the Cyanotech board would return the focus of the Company to its operating business.

"In a perfect world (I know it's not) Davis would go, the company operations get cleaned up, and Cyanotech can grow nicely organically.

- 49 -

Once Davis is on his way out, I know minority shareholders, myself included, would want to increase positions."

"This is not about M&A, but about fairness before the law.  That said, the sector is growing and without this jerk at the helm, the company's future is bright."

There are few public companies in the $30 billion vitamins and nutrition supplements market, but major transactions in the past five years support the thesis that Cyanotech is worth 3 to 5X sales versus 1X currently.

The last two big deals in the sector – in 2012 – highlighted the scope for future M&A.

Reckitt Benckiser (RB.L) bought Schiff Nutrition for $1.4 billion, besting Bayer's $1.2 billion bid for the vitamins company, and Germany's BASF (BASFn.DE) bought fish oils maker Pronova BioPharma (PRON.OL) for $845 million to boost its health supplements business.

Demand for Cyanotech's BioAstin natural astaxanthin is high, but sales are limited by the company's ability to produce the stuff, what between tropical storms and bad management decisions.



The whistleblower argues that a revolving door management-style under Davis's leadership has distracted the business at hand, and may be masking Davis's ulterior motives.

"I think Davis has been sandbagging production and has fired a succession of CEOs who tried to do the right thing.  I think his goal has been to literally scare away investors, lock down the company, and start paying out cash dividends.

Besides the shareholders, the person most wronged in Davis's opinion is former Cyanotech CEO Brent Bailey, fired without cause right before he was to vest in a large amount of stock five years into a seven-year deal.

"Davis fired him and clawed back his stock, this for the guy who was responsible for getting CYAN into Costco!"

After Davis pulled Bailey's severance agreement, the former CEO brought Davis to arbitration and won; his severance was reinstated, Davis was shown to be acting unethically and illegally.

The noose around Davis is tightening.

"There is an open investigation at SEC, and 6,200 pages have been filed with IRS."

**Meridian & Section 4943 of IRS Code**

Depending on you ask, the second or third-largest Cyanotech shareholder is Meridian OHC Partners, a New Canaan-based investment fund, which filed suit against Davis in 2016.

Section 4943 of the IRS code limits the amount of stock to 20% of a public Company that be controlled by a private foundation.

When Davis's purchases of Cyanotech shares approached and eventually exceeded 20%, he began "parking" shares with Rudolf Steiner Foundation via a Donor Advised Fund.

The parties agreed that RSF would hold the Cyanotech shares for the benefit of Ginungagap, the pass-through entity created and controlled by Davis, with two RSF executives on its board.  The two "unrelated" companies are also connected via a partnership between the two companies in the Mendocino County vineyard.

For those questioning how tight Davis is coordinating with RSF, their vineyard deal, which is still in operation and goes back to 2002-2004, is via Davis non-profit Ginungagap – the mythical Nordic abyss – and an RSF Company called Yggdrasil – the tree that connects the nine mythical Nordic worlds.

The arrangement turned RSF technically into the second-largest shareholder of Cyanotech, though clearly at Davis's request and with his money.  Ultimately, Davis is trying to paint seven non-profits as separate entities, but angry shareholders are not buying it, and neither is the judge.

Earlier this year, after a war of 13D filings, after Davis' side called for the case to be dismissed.  A US District Court judge in Nevada saw enough merit to allow it to proceed:

"Meridian's allegations exhibit a comprehensive plan by Davis to use RSF as an alter ego and use their combined interest in Cyanotech as a means of controlling it.

- 52 -

Meridian alleges that Davis has always invested in Cyanotech with a view to control it, as shown by his early placement on the Board, continued influence as its Chairman, and alleged involvement in cycling out CEOs.

Meridian further alleges that Davis used RSF to gain more influence, as shown by their close preexisting relationship, the unprecedented and never-repeated donation of $2.5 million dollars to RSF so that it could fund the purchase – that Davis allegedly negotiated – of a 9.7% interest in Cyanotech, and the subsequent transfers of stock to RSF through Davis's charitable foundation.

And Meridian sufficiently alleges that Davis and RSF have been in cahoots since at least 2011 when RSF first invested because Davis was allegedly responsible for every share that RSF acquired.

These allegations are sufficient to plead plausible claims of noncompliance with Section 13(d.

Conclusion

Accordingly, the defendants' motions to dismiss [ECF Nos. 78, 79] are DENIED.

Dated: March 15, 2018,

U.S. District Judge Jennifer A. Dorsey"

Outside of RSF, the Cyanotech shares are controlled by Davis via five non-profit vehicles, including one belonging to his wife, film director Jyll Johnstone.

She's also party to the tax fraud argument because of the non-profit movie making company Canobie Films they run together. Due to the stipulations in his father's will, Davis isn't supposed to be donating his charity dollars to organizations where he is principally benefiting. He's supposed to be giving it away, not enjoying it and avoiding tax.

Rather than cash profit, the film Company's payback is notoriety at dozens of international film festivals, with charity-paid-for entry forms, attendance fees, hotel rooms, publicity junkets, plus, obviously, the cost of producing all those the movies, which the rare Hollywood distribution deal could one day even lead to money into his pocket.

That's bad, and the farm deal is even more dodgy.

Of course, Davis argues it's a non-profit donating to a non-profit, but the fact the Davis's live adjacent to the property, along with the other partner on the deal, and they're just helping out RSF to be good neighbors, also doesn't wash.  They directly benefit, personally.

With such honest folks, the whistleblower wasn't surprised to find one of these matching Nordic-named "unrelated parties" undercharging rent to the other by an estimated $6.2 million – so, undeclared goodwill of $6,185,000:

A 30-year lease for 87 acres in Mendocino for $15,000 per annum – so shocking, it could even be illegal.

**"Davis is crooked, and we want him out."**

News of the local partnership between Davis and RSF in a tax-dodging California winery lit a new fire under Davis, forcing the latest 13 D, as the Meridian case lingers, with both hanging over Davis's future at the helm and the stock.

The whistleblower, who has dedicated the past year of retirement hours better spent on a golf course, to expose Davis via a website detailing his corruption, was sanguine about the future of the company and hopeful the pressure will force Davis's hand.

"Cyanotech could be a great company; it's [sic] product is great, company management, when allowed to do their job, performed very well.  The scope for an eventually buyout at a high valuation is also real."

But Davis is in the way.

"Davis' attitude seems to be this public Company became his private property with his original financing," the whistleblower said. "He was formally added to the board in early 2003 and been directly influencing the company for his personal benefit ever since."

His control over Cyanotech deepened in 2010, when he fired the first of several CEOs and began increasing his position in the stock.  By 2011, from the Meridian suit, Davis via RSF owned a third of the company.

The self-styled mild-mannered documentary film producer gained his initial stake in Cyanotech through a convertible bond and private stock private placement that he renegotiated to near loanshark levels.

In 2000, Davis started with a $1.25 million convertible-stock placement at 6%, with a strike price at $1.50, plus an almost equal amount of warrants at $1.80 available (when the stock was already trading above $2.)

By May, 2002, Cyanotech was fumbling, including at risk of losing its NASDAQ-listing.

The note repayment was delayed six months.  In exchange, Davis's strike price fell to $1.00, the interest rate went to 10%, plus Davis got 30% more warrants at $1.10.

In October, 2002, the loan was replaced with a new $1.25 million convertible-stock placement, directly at 10% interest, plus a whopping 750,000 warrants at a strike price of $0.65 per share, compared to stock trading above $2.

The screenshot is the disclosure in Cyanotech's 2003 SEC 10K about the original Davis investment in 2002.

*Convertible Debentures due April 30, 2002*

On May 2, 2000, the Company completed a private placement of $1,250,000 principal amount 6% convertible subordinated debentures ("Debentures") due April 30, 2002, with net proceeds to the Company of approximately $1.1 million. Interest on these Debentures was to be paid quarterly, in arrears, at a rate of 6% per annum. The Debentures were convertible into shares of the Company's common stock at a conversion price of $1.50 per share, the market price of the Company's common stock at the date of issuance. Warrants to purchase 83,334 shares of the Company's common stock were issued to the placement agent of the Debentures, exercisable for five years from the issue date, at $1.80 per share. At March 31, 2002 and 2001, the outstanding principal amount of these debentures were $1,238,000 and $1,250,000 respectively.

In May 2002, the Company reached an agreement with the holders of the Debentures to extend the maturity date by six months to October 31, 2002. In exchange for the extension, the Company agreed to: 1) reduce the conversion price from $1.50 per share to $1.00 per share (the approximate market value at date of issuance); 2) increase the interest rate during the remaining period the Debentures are outstanding from 6% to 10%; 3) issue two-year warrants to the Debenture holders to purchase additional shares of common stock of Cyanotech in an amount equal to thirty percent (30%) of the shares into which the Debentures are convertible at $1.10 per share; and 4) reduce the forced conversion price at which the Company can require the conversion of the Debentures from $3.00 per share to $1.50 per share. The terms of the aforementioned warrant issued to the placement agent in conjunction with the initial placement were also revised in this extension agreement. Under the terms of the extension, the warrant exercise price was reduced to $1.10 per share and the expiration date was accelerated to May 2004. As a result of this renegotiation of debt, the Company recorded a charge of approximately $236,000 during the year ended March 31, 2003, of which approximately $223,000 was a non-cash charge. These Debentures were retired in their entirety in October 2002.

*Convertible Debentures due September 30, 2004*

In October 2002, the Company issued in a private placement (a) $1,250,000 principal amount of 10% convertible subordinated debentures, due September 30, 2004, convertible into shares of the Company's common stock at a price of $0.65 per share and (b) 750,000 shares of common stock with proceeds to the Company of $300,000. Proceeds from the 10% convertible subordinated debentures issued in October were used to retire convertible debentures of $1,238,000 which were due to mature on October 31, 2002. The remaining net proceeds from the issuance of common stock are to be used for working capital purposes. Subsequent to the transaction the investor was elected to the Company's Board of Directors.

The amount of profit in the convertible shares at point of pricing covered the cash stock he bought in the deal.

"Shareholders are sick of this guy," the whistleblower said. "Davis and his partners are mad with power at this company, and minority shareholders feel abused."

"We're calling for the SEC and the IRS to step-it-up, and bring this man to heel."

"Davis is crooked, and we want him out."

Barton LLP in New York represents the whistleblower in the SEC filing.[28]

## DERIVATIVE ALLEGATIONS

79. Plaintiff incorporates by reference and realleges each and every allegation set forth herein.

80. Plaintiff brings this action derivatively in the right and on behalf of Cyanotech to redress injuries suffered, and to be suffered, by Cyanotech as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting thereof, by the defendants. Cyanotech is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81.  Plaintiff will adequately and fairly represent the interests of Cyanotech in enforcing and prosecuting its rights.  Plaintiff is and was an owner of Cyanotech stock at all times relevant to the wrongful course of conduct alleged herein, and remains a shareholder of the Company.

82.  As of the date this Complaint was filed, the Cyanotech Board consisted of six directors: Michael A. Davis, Gerald R. Cysewski, Nancy E. Katz, Walter B. Menzel, David M. Mulder, and David L. Vied.  Plaintiff has not made any demand

---

[28]  *Id*.

on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons that follow.

83. Defendants Davis, Cysewski, Katz, Menzel, Mulder, and Vied served as directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illegal and illicit acts alleged herein.  The statements and actions regarding the scheme to allow defendant Davis to secretly gain control of the Company by using RSF to accumulate additional Cyanotech stock for the benefit of defendant Davis (as well as other acts, statements, and omissions detailed herein) that defendants Davis, Cysewski, Katz, Menzel, Mulder, and Vied caused or allowed to occur and be made repeatedly have subjected the Company to substantial costs in responding to unnecessary lawsuits and, now, make the Company a target of whistleblower complaints filed with the IRS and the SEC.  This is a violation of (among other things) these defendants' fiduciary duties of due care, loyalty, and good faith, as well as the Company's Code of Ethics.  Thus, defendants Davis, Cysewski, Katz, Menzel, Mulder, and Vied each face a substantial likelihood of liability for their acts in connection with these statements, rendering a demand upon them futile.

84. Defendants Cysewski, Katz, Menzel, Mulder, and Vied (a majority of the Board) each face an additional substantial likelihood of liability for their participation in defendant Davis's purposeful effort to alienate shareholders who

hold a significant amount of Cyanotech stock by intentionally inhibiting the growth and performance of the Company.  Defendants' obligations to shareholders are to act loyally and in good faith to maximize shareholder returns.  However, defendants Cysewski, Katz, Menzel, Mulder, and Vied have breached their fiduciary duties of loyalty and good faith by consciously failing to stop defendant Davis's deleterious and self-serving actions to protect his control of the Company to the detriment of shareholders.  Indeed, these defendants knew or should have known about defendant Davis's egregious secret scheme to gain control of the Company, but, in any event, were alerted to his wrongdoing no later than May 24, 2016, when Meridian (the plaintiff here) filed its lawsuit exposing defendant Davis's scheme.

85.  Simply put, violating the law, approving the violation of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law and/or statutes and codes of conduct are all forms of misconduct that cannot, under any circumstances, be examples of legitimate business conduct.  Because condoning a business strategy predicated on purposefully impeding the Company's growth in order to push away shareholders who may challenge defendant Davis's control of the Company (and thus, the substantial tax breaks afforded his so-called charitable family foundations) is an illegal, bad faith, and disloyal action, it cannot under any circumstances be an example of legitimate business conduct.  Since condoning a business strategy

predicated on purposefully prohibiting the maximization of shareholder returns cannot be a valid exercise of business judgment, demand upon the Board is excused.

86. Defendant Davis faces a substantial likelihood of liability due to his secret scheme to gain control of the Company by causing RSF to purchase VitaeLab's 9.7% share of Cyanotech stock with charitable funds provided by defendant Davis and for the benefit of himself and his family, all while misleading shareholders about his purchases. Defendant Davis's failure to inform shareholders of his purchase is a disloyal and bad faith act. Thus, defendant Davis faces an additional substantial likelihood of liability for failing to properly inform shareholders of his purchase and/or control of the former VitaeLab's holdings.

87. Defendant Davis is also interested in the outcome of this litigation because he uses his so-called non-profit family foundations to pursue and satisfy his personal interests, thereby misusing the privileges afforded by non-profit laws and sheltering assets and his Cyanotech holdings from taxation by state and federal authorities, claiming they are for charitable purposes and therefore tax exempt. This effort to enrich himself through management of the purported non-profit entities while illegally attempting to claim exemption from paying taxes violates federal and state tax laws as well as IRS regulations. Thus, initiating the litigation sought by this action will subject defendant Davis to substantial likelihood of

personal liability for civil and/or criminal penalties for tax evasion, thereby rendering defendant Davis incapable of disinterestedly determining whether or not to take action based on the allegations herein.

88. Defendants Katz, Menzel, and Mulder served as members of the Audit Committee during the wrongdoing alleged herein. The members of the Audit Committee, because of their positions of control and authority over Cyanotech, were able to, and did, directly and indirectly, control the wrongful acts complained of herein. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring that the Company was in compliance with legal and regulatory requirements. The members of the Audit Committee failed to ensure that the Company had and maintained adequate internal financial controls and failed to ensure the integrity of the Company's financial statements included in proxy statements and other financial statements incorporated by reference therein. Because members of the Audit Committee had an affirmative duty to ensure that the Company maintained adequate internal controls over financial reporting and the integrity of the Company's financial statements and failed to do so, members of the Audit Committee breached their fiduciary obligations due the Company. Accordingly, defendants Katz, Menzel, and Mulder

breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein.

89. According to the Company's proxy statements filed with the SEC, the Audit Committee met at least 27 times between 2016 and 2018. Therefore, it is readily apparent that the Audit Committee likely met multiple times during the period of the misconduct and had ample opportunity and incentive to consider the wrongdoing alleged herein. Therefore, defendants Katz, Menzel, and Mulder face a substantial likelihood of liability for their breaches of fiduciary duties, and any demand upon them is futile.

90. At the time this action was initiated, the principal professional occupation of defendant Cysewski was (and is) his employment with Cyanotech as its CEO and Chief Scientific Officer, pursuant to which he receives substantial monetary compensation and other benefits. In addition, according to the Company's 2018 proxy statement, defendants have admitted that defendant Cysewski is not independent. Thus, defendant Cysewski lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

91. Any suit by the current directors of Cyanotech to remedy the wrongs complained of herein would expose the defendants themselves and their friends and business allies to significant personal liability for their breaches of fiduciary duties and other misconduct. Defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein. Each of the defendants is accused of wrongdoing and failing to stop defendant Davis's deleterious activities at the Company and, thus, faces a substantial likelihood of liability, thereby rendering any demand upon them futile.

92. Defendants were aware of and participated in and approved of the wrongs alleged herein. Thus, defendants have knowingly chosen not to exercise the fiduciary duties of loyalty and due care owed to the Company and to protect Cyanotech or to rectify the illegal practices complained of herein. Defendants therefore have approved of and continue to participate in a course of corporate misconduct that includes the following:

(a)     Defendants were involved in approving and/or condoning the illegal conduct and practices described herein. Each defendant had the ability and/or opportunity to prevent these practices. The Board is responsible for overseeing the Company's compliance with legal requirements and, therefore, all directors are liable for not ensuring that the officers and employees of the Company did not expose the

Company to unnecessary risk. Because defendants are liable for approving and directing the illegal conduct described herein, demand would be futile;

(b)    Defendants' illegal conduct is not subject to business judgment protection or subject to ratification;

(c)    The wrongful conduct complained of herein by defendants amounted to breaches of their fiduciary duties of good faith, due care, and loyalty to Cyanotech and its shareholders;

(d)    Defendants, and in particular, the members of the Audit Committee, refused to put into place adequate internal controls and adequate means of supervision to stop the wrongful conduct alleged herein, despite the fact that the Board knew and/or recklessly ignored such wrongful business practices. These acts, and the acts alleged in this action, demonstrate a pattern of gross misconduct, which conduct is not taken honestly and in good faith; and

(e)    Moreover, despite defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Cyanotech for any of the wrongdoing alleged by plaintiff herein.

93.    Plaintiff has not made any demand on Cyanotech shareholders to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Cyanotech is a publicly traded Company with over 5.8 million shares outstanding, and hundreds or thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff, who has no way of finding out the names, addresses, or phone numbers of such shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## DAMAGES

94. As a direct and proximate result of defendants' misconduct, Cyanotech has been severely damaged and injured. Moreover, defendants' faithless acts and/or omissions have irreparably damaged Cyanotech's credibility, corporate image, and goodwill. For at least the foreseeable future, Cyanotech will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Cyanotech's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as a direct and proximate result of defendants' misconduct, Cyanotech is believed to have become the subject of numerous federal whistleblower complaints and investigations.

## COUNT I

### For Breach of Fiduciary Duty
### Against All Defendants

95.     Plaintiff incorporates by reference ¶¶1-94 above.

96.     Defendants owed and owe Cyanotech fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe Cyanotech the highest obligation of good faith, fair dealing, loyalty and due care, and diligence in the management of the Company.

97.     Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.  They have each also been responsible for the gross and reckless management of Cyanotech and have ignored their fiduciary responsibilities by causing the Company to engage in the unlawful conduct described herein.

98.     Defendants engaged in the above conduct in intentional breach of their fiduciary duties to the Company.

99.     Defendants conspired to abuse, and did abuse, their positions of control and oversight at Cyanotech.

100.    As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Cyanotech has sustained significant damages.  Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company.

## COUNT II

### For Abuse of Control
### Against All Defendants

101.   Plaintiff incorporates by reference ¶¶1-94 above.

102.   Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence Cyanotech, for which they are legally responsible.

103.   As a direct and proximate result of defendants' abuse of control, Cyanotech has sustained significant damages.

104.   As a result of the misconduct alleged herein, the defendants are liable to the Company.

## COUNT III

### For Gross Mismanagement
### Against All Defendants

105.   Plaintiff incorporates by reference ¶¶1-94 above.

106.   By their actions alleged herein, the defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cyanotech in a manner consistent with the operations of a publicly held corporation.

107.   As a direct and proximate result of the defendants' gross mismanagement and breaches of duty alleged herein, Cyanotech has sustained significant damages.

108.   As a result of the misconduct and breaches of duty alleged herein, the defendants are liable to the Company.

## COUNT IV

### For Waste of Corporate Assets
### Against All Defendants

109.   Plaintiff incorporates by reference ¶¶1-94 above.

110.   As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and refusing to conduct proper supervision, defendants have caused Cyanotech to waste valuable corporate assets and incur significant expense to defend defendants' unlawful actions.

111.   As a result of the waste of corporate assets, the defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Against defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B.       Directing Cyanotech to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.       Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Cyanotech has an effective remedy;

D.       Awarding to Cyanotech restitution from defendants, and each of them, including ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

E.       Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

Dated:  Honolulu, Hawaii, _October 2_____, 2019.

WEINBERG, ROGER & ROSENFELD

*/S/ ASHLEY K. IKEDA*

ASHLEY K. IKEDA
JERRY P.S. CHANG


ROBBINS GELLER RUDMAN
   & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
(619) 231-7423 (fax)
E-mail: bennyg@rgrdlaw.com
            eluedeke@rgrdlaw.com


Attorneys for Plaintiff MERIDIAN OHC
PARTNERS, LP, Derivatively on Behalf of
CYANOTECH CORPORATION

- 69 -